In re CORAM HEALTHCARE CORP. and Coram, Inc., Debtors.

Nos. 00–3299(MFW), 00–3300(MFW).

United States Bankruptcy Court, D. Delaware.

Dec. 21, 2001.

Laura Davis Jones, Rachel S. Lowy, Christopher J. Lhulier, Pachulski Stang Ziehl Young & Jones, P.C., Wilmington, DE, David M. Friedman, Athena Foley, Adam L. Shiff, Kasowitz, Benson, Torres & Friedman, LLP, New York City, for debtors and debtors in possession.

Mark D. Collins, Deborah E. Spivack, Richards Layton & Finger, P.A., Wilmington, DE, Chaim J. Fortgang, Theodore Gewertz, Wachtell Lipton Rosen & Katz, New York City, for Committee of Unsecured Creditors.

Mark Minuti, Tara Lattomus, Saul Ewing, LLP, Wilmington, DE, Richard F. Levy, Theodore J. Low, Benjamin D. Schwartz, Altheimer & Gray, Chicago, IL, for Equity Committee.

Karen C. Bifferato, Connolly, Bove, Lodge & Hutz, Wilmington, DE, Allen B. Miller, Weil Gotshal & Manges, LLP, New York City, for Senior Noteholders.

Kenneth Eckstein, Philip Bentley, Marjorie Sheldon, Kramer Levin Naftalis & Frankel, LLP, New York City, for Goldin Associates, LLC.

Edwin J. Harron, Young Conaway Stargatt & Taylor, LLP, Wilmington, DE, for Coram Resource Network.

Elio Battista, Jr., The Bayard Firm, Wilmington, DE, Gregory D. Saputelli, Obermayer Rebmann Maxwell & Hippel, LLP, Cherry Hill, NJ, for Coram Re-

source Network Committee of Unsecured Creditors.

Don A. Beskrone, Office of U.S. Trustee, Wilmington, DE.

## *OPINION* [1]

MARY F. WALRATH, Bankruptcy Judge.

This case is before the Court on the request of Coram Healthcare Corporation ("CHC") and Coram, Inc. ("Coram" and collectively with CHC "the Debtors") for approval of their Second Joint Plan of Reorganization, dated August 1, 2001 ("the Second Plan"). The Official Committee of Equity Security Holders of CHC objected to confirmation of the Second Plan. For the reasons set forth below, we deny confirmation of the Second Plan.

## I. *FACTUAL BACKGROUND*

### A. *The Business of CHC and Coram*

Through acquisitions in the mid 1990's, the Debtors became a leading provider of alternative site infusion therapy services in the United States. Infusion therapy involves the intravenous administration of drug therapies for nutrition, anti-infection, HIV, blood factor, pain management, chemotherapy and other conditions. The Debtors financed their acquisitions by amassing large amounts of debt. As a result of that debt, the Debtors had financial difficulties through much of the late 1990's.

### B. *Crowley, Cerberus and the Debtors*

In April 1997, Cerberus Partners, L.P. ("Cerberus"), Goldman Sachs Credit Partners, L.P. ("Goldman") and Foothill Capital Corporation ("Foothill" and collectively

with Cerberus and Goldman "the Noteholders") purchased unsecured Notes issued by the Debtors with a face amount of $250 million. Cerberus, Goldman and Foothill acquired approximately 36%, 45% and 19% of the Notes, respectively. Subsequently, the Debtors agreed to allow a principal of Cerberus, Stephen Feinberg ("Feinberg"), to represent the interests of the Noteholders on the CHC board of directors. Feinberg served as a director from June 1998 until July 24, 2000.

During 1998, Feinberg met David D. Crowley, a turnaround consultant with a focus in the healthcare field ("Crowley"). In 1998 or early 1999 Crowley joined Cerberus' "bench" of CEO consultants, who are available to work for Cerberus with troubled companies on a project-by-project basis. In July 1999, Crowley and Feinberg struck an oral agreement by which Cerberus agreed to pay Crowley $80,000 a month plus expenses to serve as a consultant to distressed companies in which Cerberus had a stake. Shortly thereafter, in August 1999, at the suggestion of Cerberus, the Debtors hired Crowley as a consultant to their CEO.

During the fall of 1999, the Debtors were experiencing severe financial difficulties. As a result, their CEO resigned. In November 1999, the Debtors executed a restructuring and forbearance agreement with the Noteholders. As a condition to that agreement, the Debtors agreed to hire Crowley as their new CEO. The Debtors began negotiating with Crowley about the terms of his employment agreement, which the Debtors described as very difficult because of Crowley's compensation demands.

**1.** This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.

On November 12, 1999, while the negotiations with the Debtors were still ongoing, Crowley sent a "Personal & Confidential" letter to Feinberg, requesting additional compensation from Cerberus, in the form of incentive bonuses for consulting work he was doing on Cerberus' behalf for other distressed companies. That additional compensation was to be paid in consideration for Crowley signing an employment contract with the Debtors.

On November 18, 1999, Crowley signed a three year employment agreement with the Debtors. On November 19, 1999, Crowley executed a Consulting Agreement memorializing his oral agreement with Feinberg and Cerberus (by which Cerberus agreed to pay Crowley $80,000 a month) and increasing the performance-based bonus due to Crowley for his work on another distressed company, Winterland Productions, Inc. ("Winterland").

Section 2.3 of the Consulting Agreement with Cerberus states that Crowley "will have such duties as are assigned or delegated . . . by . . . Feinberg;" that he "will devote his entire business time, attention, skill and energy exclusively to the business of [Cerberus] (or any . . . Companies . . . to which [he] is assigned by [Cerberus] );" and that he "will use his best efforts to promote the success of [Cerberus'] business (or the business of such . . . Company)."

Under section 6.3 of the Consulting Agreement, Cerberus had the right to terminate Crowley "for cause," including Crowley's "failure to follow the reasonable instructions of [Cerberus] . . ., Feinberg, or the Board of Directors of [the Debtors]."

Section 3.1 of the Consulting Agreement states that Crowley's salary "shall be reduced and offset . . . for any directors fees, salary, consulting payments, bonuses or other cash incentive payments that [Crowley] may receive from any [of Cerberus' business] other than [the Debtors]."

Neither Crowley, nor Feinberg (who was a director of the Debtors at the time) disclosed the terms of the Consulting Agreement between Cerberus and Crowley to the Debtors.[2]

## C. *Financial Difficulties*

Despite efforts to cut costs, the Debtors faced enormous financial difficulties by the end of 1999. As a result, the Debtors began contemplating restructuring options and consulted with bankruptcy counsel. On June 9, 2000, the Debtors sold their pharmacy business, generating approximately $38 million in net cash proceeds. Those proceeds were used in part to pay down the Debtors' secured revolving line of credit, which had been provided by the Noteholders. On July 14, 2000, the Debtors, at the direction of Crowley, made a $6.3 million interest payment in cash to the Noteholders for their unsecured Notes. Under the terms of the Notes, the Debtors could have paid the interest payment "in kind," i.e., by adding it to the outstanding principal balance of the Notes. Crowley did not tell the board of directors, or bankruptcy counsel, about the cash payment to the Noteholders until after it had been made.

A few days later on July 24, 2000, Feinberg resigned from the Debtors' board of directors. On August 8, 2000, as a result of their mounting financial difficulties, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

---

**2.** Crowley testified that he did disclose to the Debtors that he "had a relationship with Cerberus." However, he, Feinberg and all the members of the Debtors' board of directors testified that the terms of that relationship were not disclosed.

Since then, the Debtors have continued to operate their businesses in the ordinary course of business as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. Crowley has continued to serve as CEO of the Debtors.

As of the bankruptcy filing date, the Noteholders were owed in excess of $252 million and the trade creditors were owed approximately $7.5 million. On August 22, 2000, the United States Trustee appointed an Official Committee of Unsecured Creditors ("the Creditors' Committee"). The Creditors' Committee includes two Noteholders and one trade creditor. On October 18, 2000, the United States Trustee appointed an Official Committee of Equity Security Holders to represent the interests of the holders of CHC common stock ("the Equity Committee").

### D. *First Plan of Reorganization*

On the petition date, the Debtors filed their First Joint Plan of Reorganization ("the First Plan"). The First Plan provided for the cancellation of all shareholder interests and the issuance of the stock of the Debtors to the Noteholders. The First Plan proposed paying the rest of the general unsecured creditors $2 million. The First Plan was supported by the Noteholders and the Creditors' Committee but was opposed by the Equity Committee.

In December, 2000, a hearing was held over five days to consider confirmation of the First Plan. During discovery related to those hearings, the terms of Crowley's Consulting Agreement with Cerberus were revealed for the first time.

At the conclusion of the confirmation hearings, we found that Crowley's Consulting Agreement with Cerberus created an actual conflict of interest on his part. We further held that the conflict of interest "has ... tainted the Debtors' restructuring of its debt, the Debtors' negotiations towards a plan, even the Debtors' restructuring of its operations." (Dec. 21, 2000 N.T. at p. 88.) We concluded that "the ultimate fairness of the process in bankruptcy is a paramount principle to be protected by the Bankruptcy Court" and that that process had been tainted by Crowley's conflict of interest. (*Id.* at p. 87.) As a result, we concluded that we were unable to find that the Debtors had proposed their plan in good faith in accordance with section 1129(a)(3) of the Bankruptcy Code and, accordingly, denied confirmation of the First Plan.[3]

### E. *The Goldin Report and the Special Committee*

Following denial of confirmation of the First Plan, the Debtors created a special committee of independent directors ("the Special Committee"). The Special Committee appointed Harrison J. Goldin of Goldin Associates, L.L.C. ("Goldin"), a financial advisory firm specializing in distressed situations, to perform an impartial evaluation of the Debtors' affairs, Crowley's relationship with Cerberus, and other issues relating to confirmation of a plan.

On February 26, 2001, we granted the Debtors' motion to retain Goldin to investigate the extent of Crowley's conflict of interest and the damage, if any, which was done to the Debtors as a result. At that time, we also directed the parties to stay

---

**3.** The Equity Committee had also opposed confirmation of the First Plan on the basis that the Debtors were undervaluing their enterprise worth and that there was equity for shareholders. Although we expressed some doubt as to the Equity Committee's valuation testimony, we did not address this issue since we concluded that the Debtors' Plan was unconfirmable at any rate.

litigation between them[4] and directed that Goldin attempt to mediate a plan.

After his investigation, Goldin circulated to the parties a draft report and solicited comments in June, 2001. On July 11, 2001, Goldin issued his final report ("the Goldin Report"). Again, this was circulated to the parties, but not filed with the Court. The Goldin Report concluded that:

1. Crowley and Feinberg should have disclosed the full extent of the Crowley/Cerberus relationship to the Debtors' other directors and officers and the failure to do so was a breach of their respective fiduciary duties.

2. There was no evidence that the Debtors' books and records were compromised or materially impaired by Crowley's conflict of interest.

3. There was no evidence that Crowley or Feinberg intended or expected that Crowley would seek to advance Cerberus' interests to the detriment of the Debtors.

4. There was no evidence that Cerberus (or the other Noteholders) ever instructed Crowley to act contrary to the Debtors' interests.

5. Crowley did advance the interests of Cerberus at the expense of the Debtors by making the $6.3 million cash payment to the Noteholders on July 14, 2000, at a time when the Debtors' cash was low and a bankruptcy filing was under active consideration. Nonetheless, Goldin concluded that the cash payment did not affect the Debtors' solvency, the Noteholders' position vis-a-vis other creditors or impact other creditors.

6. The Debtors did suffer damages caused by the undisclosed conflict of interest, namely, the professional fees ($5 to $6 million) and possible business losses ($7 to $9 million) resulting from the Debtors' inability to obtain confirmation of the First Plan.

7. Crowley's bonus compensation under his agreement with the Debtors should be reduced by $7.5 million, resulting in Crowley receiving a $5.9 million bonus in addition to his base salary of $650,000.

### F. The Second Plan of Reorganization

The Special Committee, after consultation with Goldin, determined to incorporate Goldin's recommendations into a revised plan of reorganization. Under the Second Plan, the Noteholders will again receive all the equity in CHC. The Second Plan provides that Crowley's compensation will be reduced as recommended by the Goldin Report. The Second Plan also provides that the shareholders will receive a distribution of $10 million in cash so long as their class votes in favor of the Second Plan and the creditors do not object to confirmation on the basis of the absolute priority rule.

The shareholders did not, however, accept the Second Plan by the percentages required by the Code. Once again, the Equity Committee opposed confirmation of the Plan.[5]

### G. Second Plan Confirmation Hearing

Hearings to consider confirmation of the Second Plan were held on seven days over

4. The Equity Committee had filed a Motion seeking authority to prosecute an action *inter alia* against Crowley for breach of fiduciary duty.

5. The Official Committee of Unsecured Creditors appointed in the Coram Resource Network, Inc. ("R–Net") case also objected to confirmation. That objection was resolved by the agreement of the Debtors that confirmation of the Second Plan would not release any claim R–Net or its Committee might have against the Debtors.

the past two months. Mr. Goldin testified regarding the focus and scope of his examination. Specifically, he limited his investigation to events prior to the confirmation hearing in December, 2000. He did not investigate any of the activities of the Debtors since that time. Significantly, he did not determine whether Crowley continued to receive compensation under the Cerberus agreement. He did not ask and no one disclosed that fact. Nor did Goldin determine whether there was any ongoing harm to the Debtors by the continuation of Crowley as CEO and president of the Debtors after December 2000, as a result of his continued compensation by Cerberus under his Consulting Agreement. Mr. Goldin testified, however, that he assumed Crowley would do no harm to the Debtors after his arrangement with Cerberus had been revealed because he had done no harm prior to it being disclosed.

Mr. Amaral, a member of the board of directors and the Special Committee [6], testified that Goldin was hired to "sprinkle holy water on the situation" and make everything all right. Other than hire Goldin and review his report, the Special Committee took no other action in response to denial of confirmation of the First Plan. Significantly, it did not conduct any investigation of Crowley's conflict of interest, did not require that Crowley cease accepting any compensation from Cerberus and did not even ask Crowley if the conflict persisted.[7]

## II. DISCUSSION

### A. Lack of Good Faith Under Section 1129(a)(3)

■ In order for a court to confirm a plan it must be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).

■ "The good faith standard requires that the plan be 'proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code.'" *In re Zenith Electronics Corp.*, 241 B.R. 92, 107 (Bankr.D.Del.1999) (*quoting In re Sound Radio, Inc.*, 93 B.R. 849, 853 (Bankr.D.N.J.1988)) [8]. In evaluating the totality of circumstances surrounding a plan a court has " 'considerable judicial discretion' in finding good faith, with the most important feature being an inquiry into the 'fundamental fairness' of the plan." *In re American Family Enterprises*, 256 B.R. 377, 401 (D.N.J.2000)(*quoting In re New Valley Corp.*, 168 B.R. 73, 80–81 (Bankr.D.N.J.1994)).

At the conclusion of the hearing on the First Plan, we concluded that the Debtors' CEO and President had an actual conflict of interest by virtue of the fact that he had a separate employment contract with one

**6.** Although he is a member of the Special Committee, Mr. Amaral was formerly the CEO of the Debtors, was integral to bringing in Crowley, and negotiated the terms of Crowley's compensation for the Debtors.

**7.** Although Crowley testified that he told the Board of Directors that he continued to receive compensation from Cerberus, we do not credit that testimony. All of the directors testified in their depositions that he did not tell them (nor did they ask him) whether he continued to receive that compensation.

**8.** *See also Hanson v. First Bank of South Dakota, N.A.*, 828 F.2d 1310, 1315 (8th Cir. 1987)(must have reasonable likelihood plan will achieve result consistent with the Code); *Connell v. Coastal Cable T.V., Inc.*, 709 F.2d 762, 764 (1st Cir.1983)(plan must bear some relationship to Code's objective of resuscitating a financially troubled company); *In re Mortgage Inv. Co.*, 111 B.R. 604, 611 (Bankr. W.D.Tex.1990)(good faith requires a legitimate, honest purpose to reorganize and a reasonable probability of success).

of the Debtors' largest creditors under which he was being paid almost $1 million per year. Because the Consulting Agreement required that Crowley obey the instructions of Cerberus and because the compensation being paid him under that agreement was not insubstantial[9], we concluded that the Consulting Agreement created an actual conflict of interest.

Today we are faced with a similar task. Nothing, in fact, has changed since the first confirmation hearing. Crowley continues to receive almost $1 million a year from one of the Debtors' largest creditors, while serving as the Debtors' CEO and President. Under his agreement with Cerberus, he is required to obey its instructions or risk having the agreement terminated and losing his $1 million. This is an actual conflict of interest, as we concluded at the first confirmation hearing.[10]

B. *Duty of Loyalty Owed by Debtors' CEO*

■ A debtor in possession is bound by a duty of loyalty that includes an obligation to refrain from self dealing, to avoid conflicts of interests and the appearance of impropriety. *See e.g., Lopez–Stubbe v. Rodriguez–Estrada (In re San Juan Hotel Corp.),* 847 F.2d 931, 950 (1st Cir.1988); *Bennett v. Gemmill (In re Combined Metals Reduction Co.),* 557 F.2d 179, 196–97 (9th Cir.1977).

■ The duty of loyalty owed by a debtor in possession is also owed by its senior officers. As the Supreme Court articulated in *Wolf v. Weinstein:*

> The concept of leaving the Debtor in possession, as a "receivership without a receiver," was designed to obviate the need to appoint a trustee for the supervision of every small corporation undergoing reorganization, even though it appeared capable of carrying on the business during the proceeding .... But so long as the Debtor remains in possession, it is clear that the corporation bears essentially the same fiduciary obligation to the creditors as does the trustee for the Debtor out of possession. Moreover, the duties which the corporate Debtor in possession must perform during the proceeding are substantially those imposed upon the trustee. It is equally apparent that in practice *these fiduciary responsibilities fall not upon the inanimate corporation, but upon the officers and managing employees who must conduct the Debtor's affairs under the surveillance of the court.* If, therefore—as seems beyond dispute from the very terms of the statute—the trustee is himself a fiduciary ... logic and consistency would certainly suggest that those who perform similar tasks and incur like obligations to the creditors and shareholders should not be treated differently under the statute for this purpose.

*Wolf v. Weinstein,* 372 U.S. 633, 649–50, 83 S.Ct. 969, 10 L.Ed.2d 33 (1963)(emphasis

---

9. The Debtors, Noteholders and Crowley argued that the $1 million compensation being paid to Crowley under the Consulting Agreement was not high considering his expertise in troubled companies in the healthcare industry. However, it is certainly more than a de minimis amount and is more than the base salary which the Debtors themselves were paying Crowley.

10. At the second confirmation hearing, evidence was presented that the agreement between Crowley and Cerberus is also contrary to the express provisions of the Debtors' corporate policy which at all relevant times provided that actual conflicts of interest must be avoided and that any action that might create a potential conflict of interest must be disclosed and approved in advance.

added).[11]

■ Crowley, as Chief Executive Officer and President of the Debtors, has a fiduciary duty to the estate, which includes the duty of loyalty and an obligation to avoid any direct actual conflict of interest. In this case, Crowley's actual conflict of interest goes beyond the mere appearance of impropriety. Crowley cannot serve the interests of both the Debtors and a large creditor, Cerberus. Under the Consulting Agreement, Cerberus has the discretion to fire Crowley if he fails to follow its instructions, resulting in the loss of $1 million per year in compensation to Crowley. That control over Crowley, and indirectly the Debtors, is simply not proper.

Crowley himself demonstrated the insidious effect of that conflict when he caused the Debtors to pay in cash, rather than Notes, the $6.3 million interest payment due to the Noteholders immediately before the bankruptcy filing. Crowley's explanation that the payment was made to maintain the Noteholders' support is unconvincing. The Debtors, under Crowley's direction, had recently repaid the Noteholders almost $38 million and had no legal obligation to pay the $6.3 million in cash. Crowley's assertion that he preferred to pay cash rather than add the amount to the Debtors' debt structure is also incredible. The Debtors have argued that they are hopelessly insolvent; therefore it would make no difference if the Debtors were underwater by an additional $6.3 million in debt.

In contrast, Mr. Goldin readily admitted that every company facing the prospect of a bankruptcy filing seeks to conserve cash. Having cash available at the early stages of a bankruptcy case gives a debtor significant operational advantages, as well as an enhanced negotiating position vis-a-vis its creditors. At a minimum, the actions of Crowley denied the Debtors that option.

Crowley asserts, however, that the Consulting Agreement with Cerberus deals not with his services as CEO of the Debtors but for work which he is performing for Cerberus in connection with another company, Winterland. We, quite simply, do not believe this. Crowley testified that he is working "more than full time" on the Debtors' affairs for a base compensation of $650,000. This is in contrast to compensation of $1 million allegedly for serving only as chairman of the board of Winterland.[12] We do not accept Crowley's assertion that his compensation from Cerberus under the Consulting Agreement is solely for his work for Winterland.[13]

Actual conflicts of interest of debtor's officers in bankruptcy are usually found in the context of prosecution of avoidance actions which the debtor may have against the officers themselves or against creditors whose debt was guaranteed by the officers. Such a conflict of interest may warrant appointment of an impartial trustee. *See, e.g., In re Tel–Net Hawaii, Inc.,* 105 B.R. 594, 595 (Bankr.D.Hawai'i 1989)(controlling shareholder as fiduciary to estate had

---

**11.** The Supreme Court reaffirmed this standard for debtors in possession under chapter 11 of the Bankruptcy Code in *Commodity Futures Trading Com'n v. Weintraub,* 471 U.S. 343, 355, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985).

**12.** Both the agreements provide incentive bonuses for Crowley based on the companies' performance.

**13.** It was also disclosed in the confirmation hearings held on the Second Plan that Winterland is itself in a bankruptcy proceeding. Given the failure of Cerberus and Crowley to disclose the Consulting Agreement in this case, we are forwarding a copy of this Opinion to Judge Randall Newsome who is handling the Winterland case to apprise him of these facts.

a conflict of interest where preferential transfers were made for liabilities guaranteed by controlling shareholder warranting appointment of an impartial trustee); *In re Sal Caruso Cheese, Inc.*, 107 B.R. 808, 820 (Bankr.N.D.N.Y.1989)(president's failure to pursue preferential transfers against supplier for liabilities guaranteed by president warranted conversion of case to chapter 7 for bad faith).

There is a similar conflict of interest here, though more attenuated. In this case, the $6.3 million payment to the Noteholders might be avoidable as a preference. The Debtors have taken no action to pursue that preference and, while the Second Plan preserves such actions, since the Noteholders would own the Debtors post-confirmation it is unlikely they will sue themselves. Crowley's contractual relationship with Cerberus, just like a guarantee, creates a disincentive for him to cause the Debtors to pursue such an action.

While a debtor in possession has discretion not to pursue avoidance actions, the fact that the Debtors' CEO has a contractual impediment to pursuing that action raises questions about the reasons the Debtors in this case chose not to pursue that action. As we noted in the first confirmation hearing, given the actual conflict of interest which the Debtors' CEO has, we are unable to conclude that any action taken by the Debtors which may impact on the rights of Cerberus were taken without any undue consideration of the interests of Cerberus. Consequently, we must once again deny confirmation of the Debtors' Plan because we are unable to determine under all of the circumstances that the

Debtors' Second Plan has been proposed in good faith under section 1129(a)(3).

### C. Harm to the Debtors

The Debtors argue that we must confirm the Debtors' Second Plan because they hired an independent investigator who concluded that the conflict of interest did not result in any harm to the Debtors. We cannot accept this "no harm, no foul" argument for several reasons.

First, there is really no evidence that there was no harm resulting from the conflict of interest. In fact, Mr. Goldin concluded that the Debtors did suffer harm as a result of Crowley's conflict because it caused a delay in confirmation of the Debtors' First Plan, thereby resulting in loss of profits and additional expenses to the Debtors' estates of $12 to $15 million.

Furthermore, although Mr. Goldin concluded that the $6.3 million payment to the Noteholders on the eve of bankruptcy did not ·cause harm to the Debtors, we disagree. All responsible advisors to companies contemplating a bankruptcy filing recommend that cash be conserved (not spent) on the eve of bankruptcy. Having cash gives the debtor the ability to continue to operate and a position of strength in negotiations with creditors. That position of strength was eroded by Crowley's directing the Debtors to pay the Noteholders in cash, when they could have paid in Notes.

In addition, Goldin investigated only the actions of Crowley prior to the confirmation hearing on the First Plan in December, 2000.[14] Mr. Goldin stated that he

---

14. The Equity Committee also criticizes the method used by Goldin in investigating the conflict situation: by using informal interviews with the interested parties rather than by formal discovery and depositions under oath and by failing to investigate why the Debtors' performance was so much worse than its competitors during this period. (The Equity Committee's theory is that Crowley did not operate the Debtors to their optimum in order to keep their value low to justify stripping equity of any ownership interest.) While

believed his job was limited to determining whether any harm was caused by the conflict of interest as of that date. There was no investigation by Goldin (or the Debtors)[15] of Crowley's continued conflict of interest or whether any harm has been suffered by the Debtors since then. This is particularly highlighted by the fact that neither Goldin nor the Debtors' Special Committee even asked Crowley whether he continued to be compensated by Cerberus.

Thus, there is absolutely no evidence from which the Court can conclude that the Debtors have suffered no harm from Crowley's continued conflict of interest. Mr. Goldin's assertion that there must be no harm since the disclosure of the relationship because no harm was caused by Crowley when the relationship was hidden is not logical, nor is it borne out by the facts. Crowley did cause harm to the Debtors while his relationship with Cerberus was hidden and there is no reason to assume he did not cause harm to the Debtors when that relationship was disclosed.

■ Finally, even if there were no evidence of harm to the Debtors, appropriate sanctions may still be warranted. In a corporate reorganization proceeding, where a fiduciary was serving more than one master or was subject to conflicting interests, liability may be imposed, notwithstanding lack of fraudulent intent or harm. *See Woods v. City Nat. Bank & Trust Co. of Chicago*, 312 U.S. 262, 268, 61 S.Ct. 493, 85 L.Ed. 820 (1941)("Only strict adherence to these equitable principles can keep the standard of conduct for fiduciaries 'at a level higher than that trodden by the crowd'."). In *Woods*, the Supreme Court denied compensation to an attorney who had a conflict of interest, notwithstanding that no actual harm was shown.

In *Mosser v. Darrow*, the Supreme Court stated that "Equity tolerates in bankruptcy trustees no interest adverse to the trust. This is not because such interests are always corrupt but because they are always corrupting." *Mosser v. Darrow*, 341 U.S. 267, 271, 71 S.Ct. 680, 95 L.Ed. 927 (1951) (personal dealings in securities adverse to the interests of the debtor by employees of the trustee imposed liability on the employees, despite lack of evidence of any wrongdoing).

Therefore, we conclude that the actual conflict of interest mandated that the Debtors do more than they did in this case. Notwithstanding the fact that the Debtors learned in December, 2000, that Crowley had a conflict of interest, neither the Debtors nor their Special Committee required that Crowley disassociate himself from Cerberus. In fact, they did not even ask whether he continued to be bound by the Consulting Agreement. Given the fact that Crowley had not disclosed the agreement in the first place, the Debtors should have asked for full disclosure and required that Crowley sever all agreements with Cerberus as a condition of continued employment. The "don't ask, don't tell" approach adopted by the Debtors and their Special Committee does not fulfill their fiduciary duty to these estates.

### D. *Disclosure Does Not Cure the Conflict of Interest*

The Debtors argue that any problem caused by the conflict of interest has been

---

we make no conclusion about which method is better, we do note that Goldin discovered nothing that the Equity Committee had not already discovered in the discovery taken by it in connection with the Debtors' confirmation proceedings in December, 2000.

**15.** The members of the Special Committee testified in their depositions that they did nothing with respect to the conflict of interest other than hire Goldin.

cured by its disclosure. They note that the agreement between Cerberus and Crowley has now been disclosed in the Debtors' filings with the SEC and in the Disclosure Statement accompanying the Second Plan.

However, the Court cannot help but observe that the disclosure came only after the agreement came to light in discovery in connection with the First Plan. Neither Cerberus nor Crowley voluntarily disclosed the agreement to the Debtors or to the Court. As noted, the failure to disclose was a violation of the Debtors' corporate policy.[16]

■ Further, even disclosure of the conflict may not be sufficient to permit approval of a transaction involving an actual conflict of interest. *See, e.g., In re Allied Gaming Management, Inc.*, 209 B.R. 201, 203 (Bankr.W.D.La.1997) (debtor's former accountant and general manager could not acquire estate property under reorganization plan because there is an absolute bar on fiduciaries acquiring estate property and it "created an impermissible appearance of impropriety"); *In re Grodel Mfg., Inc.*, 33 B.R. 693, 696 (Bankr.D.Conn.1983)(former trustee could not purchase stock in a reorganized company under a proposed plan of reorganization, based upon the appearance of impropriety).

The Debtors argue that the actions of the Special Committee were consistent with the guidance provided in our decision in *Zenith*, 241 B.R. 92. We find that case easily distinguishable. *Zenith* involved a prepackaged Chapter 11 plan negotiated between a debtor-corporation and its controlling shareholder. Under the plan the shareholder was to receive 100% of the

equity in the reorganized debtor in exchange for its forgiveness of $200 million of debt and new funding of $60 million. In analyzing "good faith" under section 1129(a)(3), we concluded that that section was "broad" and incorporated non-bankruptcy law such as Delaware corporate law, as well as principles of bankruptcy law. *Id.* at 108. Under Delaware corporate law, we concluded that we were required to determine whether the plan was "entirely fair" because it dealt with a transaction between a company and its controlling shareholder. *Id.* Under Delaware corporate law this requires both a fair process and a fair price.

Applying those principles, we concluded that the price paid by the shareholder to acquire its new equity interest in the debtor was fair in light of the debtor's value as a going concern. We also held that the process was fair because the plan was negotiated and approved, after appropriate disclosures, by separate counsel representing the debtor and the controlling shareholder. *Id.*

This case is distinguishable. Here initially there were not appropriate disclosures of the conflict of interest of Crowley. Furthermore, there can be no finding that the Debtors have acted in good faith in this case because Crowley has continued to serve as the Debtors' CEO. This is not a situation, like *Zenith*, where the conflict related to one transaction, the plan; the conflict in this case transcends every single thing Crowley does on behalf of the Debtors. Because Cerberus is such a large creditor of this estate and because the Consulting Agreement requires that Crowley follow the directions of Cerberus,

---

**16.** Even if the Debtors' corporate policy did not require such disclosure, the Court would expect a debtor in possession to disclose to the Court and its creditors any agreement which its senior management might have with its largest creditors similar to the agreement at issue here.

to determine "entire fairness" in this case would require that every single action of the Debtors be examined or that Crowley be excluded from consideration of every decision that could affect Cerberus' interests. This has not been done, and cannot be done, given the CEO's pervasive role in the affairs of a corporation.

While the Special Committee and the Goldin Report focused on disclosure, they failed to enforce the separate boundaries necessary between a debtor and creditor in formulating a Chapter 11 plan of reorganization.

We easily conclude from the totality of circumstances surrounding the Second Plan that a continuous conflict of interest by the CEO of the Debtor precludes the Debtors from proposing a plan in good faith under 1129(a)(3). As we held in denying confirmation of the First Plan, Crowley's conflict of interest is a violation of his fiduciary duty to the Debtors and the estate and is so pervasive as to taint the "Debtors' restructuring of its debt, the Debtors' negotiations towards a plan, even the Debtors' restructuring of its operations." (Dec. 21, 2000 N.T. at p. 88.) The Debtors' hiring of Goldin to "sprinkle holy water on the situation" does not cure the conflict or evidence good faith.

## IV. *CONCLUSION*

For all the foregoing reasons, we cannot conclude that the Second Plan satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code as being proposed in good faith. An appropriate Order is attached.

1. The parties filed the petition and the adversary proceeding under their proper names as required by FED.R.CIV.P. 10(a). In deference to the minor child involved and to the Appellate Division of the Superior Court of New Jersey, this court in its discretion refers to the parties by the initials and pseudonyms

### *ORDER*

AND NOW, this **21ST** day of **DECEMBER, 2001,** for the reasons set forth in the accompanying opinion, it is hereby

**ORDERED** that confirmation of the Second Joint Plan of Reorganization of Coram Healthcare Corporation and Coram, Inc., under Chapter 11 of the Bankruptcy Code filed on August 1, 2001, is hereby **DENIED.**