**In re ACANDS, INC., Debtor.**

**No. 02–12687(RJN).**

United States Bankruptcy Court, D. Delaware.

Jan. 26, 2004.

Corporation, Washington, DC, Edwin J. Harron, Young, Conaway, Stargatt & Taylor, Wilmington, DE, John L. Horan, Cline, Williams, Wright, Johnson, Lincoln, NE, Kartar S. Khalsa, Pension Benefit Guaranty Corporation, Office of the General Counsel, Washington, DC, Steven K. Kortanek, Klehr, Harrison, Harvey, Branzburg & Ellers, Wilmington, DE, Carl N. Kunz III, Morris, James, Hitchens & Williams LLP, Wilmington, DE, William J. Marsden, Jr., Fish & Richardson P.C., Wilmington, DE, Kathleen M. Miller, Smith, Katzenstein & Furlow LLP, Wilmington, DE, Thomas D. Walsh, McCarter & English, LLP, Wilmington, DE, for Creditors.

Kathleen Judith Campbell, Campbell & Levine LLC, Wilmington, DE, Marla Rosoff Eskin, Campbell & Levine, LLC, Wilmington, DE, Mark T Hurford, Campbell & Levine, LLC, Wilmington, DE, Aileen F. Maguire, Campbell & Levine, Wilmington, DE, for Creditor Committees.

Curtis A. Hehn, Pachulski, Stang, Ziehl, Young & Jones, Wilmington, DE, Laura Davis Jones, Pachulski, Stang, Ziehl, Young & Jones, Wilmington, DE, Michael Paul Migliore, Pachulski, Stang, Ziehl, Young & Jones, Wilmington, DE, for Debtor.

Michael Paul Migliore, Pachulski, Stang, Ziehl, Young, Jones, Wilmington, DE, James E. O'Neill, Pachulski, Stang, Ziehl, Young & Jones, Wilmington, DE, for Debtor.

Duane David Werb, Werb & Sullivan, Wilmington, DE, for Appellant.

William Wright Banks, Jr., Georgia Attorney General's Office, Atlanta, GA, Joseph M. Barry, Young, Conaway, Stargatt & Taylor LLP, Wilmington, DE, Lindsey W. Cooper, Jr, U.S Dept of Justice, Tax Division, Washington, DC, Joseph Theodore Chapman, Attorney General of Ohio, Columbus, OH, Richard H. Cross, Jr., Cross & Simon, LLC, Wilmington, DE, Brent Fraim, Pension Benefit Quaranty

## FINDINGS OF FACT AND CONCLUSIONS OF LAW RE: CHAPTER 11 PLAN CONFIRMATION

RANDALL J. NEWSOME, Chief Judge.

This Chapter 11 case is before the court pursuant to a December 15, 2003 confirma-

tion hearing on the debtor's proposed Chapter 11 plan of reorganization. On January 23, 2004 the undersigned dictated proposed findings of fact and conclusions of law on this matter into the record. To the extent that record differs from the contents of this document, this document shall control. Although there is some doubt whether this court has core or non-core jurisdiction under 28 U.S.C. § 157(b)(2) as to the confirmation of a Chapter 11 plan in which the debtor seeks relief under 11 U.S.C. § 524, the court will assume that this proceeding is noncore, and issue these proposed findings in accordance with Bankruptcy Rule 9033.

The history of ACandS is fully expounded in the debtor's court-approved disclosure statement, and may be summarized as follows; from the time of its formation in 1958, ACandS was engaged in the commercial and industrial installation of insulation, much of which, until 1985, contained asbestos. In 1969, ACandS became a wholly-owned subsidiary of Irex Corporation, a small, publicly-traded holding company. Between 1997 and 2001, ACandS generated revenues of as much as $115,000,000 a year, but its profits from those revenues were meager. Its most profitable year was 1999, when profits reached $2,581,000. Between 1999 and May of 2001, ACandS upstreamed $6 million in dividends to Irex. It made over $5 million in loans to Irex, of which some $4.1 million were due and owing as of the petition date.

Effective July 1, 2001, ACandS sold certain of its assets to Lancaster Acquisition, LLC, a wholly-owned Irex subsidiary, for $691,315. All of those assets were subsequently distributed to Lancaster Acquisition subsidiaries. ACandS retained its accounts receivable, from which it realized some $13.7 million, as well as other operating assets. However, its operating revenues during 2002 dropped to $191,000.

Although it has continued to work on some contracts, it is fair to say that as of September 16, 2002, the date its bankruptcy petition was filed, the company was and is essentially moribund. Its only full time employee is its president, James Hipolet, who is also its general counsel.

Beginning in the late 1970's, ACandS was caught up in the wave of asbestos personal injury claims that began to sweep the country. Asbestos claims against ACandS increased in the late 1990s as more asbestos defendants filed for Chapter 11 protection. From 1958 until at least 1980, ACandS purchased liability and excess policies that contained no asbestos exclusion provisions. ACandS's primary insurers during this period were Travelers Indemnity Co. and Aetna Casualty and Surety Co., which later was purchased by Travelers. Although all of the product liability coverage in these policies is subject to annual aggregate limits, ACandS alleges that the non-product liability coverage in some or all of these policies has no such limits, and that Travelers may owe billions of dollars under this non-product coverage. This issue, along with a myriad of others, has been the subject of numerous disputes, agreements, ADR proceedings and lawsuits over the last 20 or more years. ACandS has entered into final settlements with many (if not all) of its other insurers that will bring millions of dollars into the estate. But the only real hope for recovery for most of its approximately 300,000 asbestos claimants holding some $3 billion in claims hinges on success in its coverage claims against Travelers.

Until sometime in 2001, ACandS's asbestos liabilities did not impact its profitability, since those liabilities were covered under its insurance policies. However, during a meeting in September of 2001,

Travelers Informed ACandS that it was approaching the limits of its policies, and that it was unwilling to continue providing coverage except in the context of a prepackaged bankruptcy and the issuance of a § 524(g) injunction. During the autumn of 2001, negotiations between Travelers, ACandS and a "pre-petition asbestos plaintiffs committee" (hereafter referred to as the prepetition committee) ensued. The members of that committee, which was composed exclusively of asbestos plaintiffs' lawyers, were Armand Voltz from Baltimore, Maryland; Russell Budd from Dallas, TX; John Cooney from Chicago, Ill.; Steven Kazan from Oakland, CA; Gary Kendall from Charlottesville, VA; Joseph Rice from Mt. Pleasant, SC; Bryan O. Blevins from Beaumont. TX; Thomas Scott from Jackson, MS; Steve Baron from Dallas, TX; Mark Iola from Dallas, TX; and Perry Weitz from New York, NY.

After a number of meetings, Travelers dropped out of the negotiations. Instead of simply filing a Chapter 11 petition at that point, the company embarked upon the following course:

> In anticipation that Travelers Casualty might refuse to honor its coverage obligations and because ACandS did not have significant non-insurance assets to fund ongoing settlements, ACandS decided to attempt to settle trial-listed and other asbestos-related bodily injury claims at fair values in consideration for an assignment to settled asbestos claimants of interests in and proceeds from specified insurance policy limits. ACandS also established the Pre–Petition Trust to, among other things, hold a security interest in certain ACandS insurance proceeds for the benefit of the settled asbestos plaintiffs.

Disclosure statement, p. 29.

This settlement regimen was slowly implemented during late 2001 and early 2002. Until at least the end of 2001, the Philadelphia law firm of Gollatz Griffin & Ewing P.C. represented ACandS in asbestos claim settlement negotiations. The law firm of Gilbert Heintz and Sullivan("GHR") represented ACandS in negotiations regarding the prepackaged bankruptcy. *In re ACandS Inc.,* 297 B.R. 395, 398; 403 (Bankr.D.Del.2003)(hereafter *ACandS I*). On or about December 18, 2001, this arrangement changed. By way of a retention letter of that date, GHR, along with MFR Consulting Services, Inc., took over the task of settling the asbestos claims.

Sometime in April of 2002, Travelers informed ACandS that it would no longer provide coverage for asbestos claims brought against it. Again, rather than file a Chapter 11 petition and sort out its asbestos liabilities through a postpetition asbestos trust, ACandS pushed forward with its settlement program. On April 11, 2002 James Hipolet executed the prepetition trust agreement and the security agreement and assignment in favor of the trust. Mr. Dan B. Lain of Dallas, TX, was selected by the prepetition committee to be the trustee. The trust memorializes the prepetition committee's agreement that there would be five categories of secured asbestos claimants, to be paid in descending order of priority. Category A claimants were to be paid before the bankruptcy filing. Although the disclosure statement acknowledges payment in full of this class out of some $24,000,000 in insurance coverage settlements, it is not known when those payments actually occurred. Categories Ex and By apparently received partial payments on their claims prepetition, but as with Category A, the dates of those payments are unknown. The dates when claimants' right to payments and when the security interests were perfected

are also unknown. Both of the B categories and Category C were fully secured, while Category D claimants were secured only to the extent of 75% of their claims, with the remaining 25% to be unsecured. However, Class D was entitled to only 50% of the insurance proceeds recovered. The other 50% was reserved for future claimants. Anyone who did not fall into one of these five categories would be treated as an unsecured claimant. Unless the trust realizes a resounding victory in its coverage dispute with Travelers, it is unlikely that claimants in the unsecured category will receive anything.

At trial, Mr. Hipolet and asbestos plaintiffs' attorney, Matthew Bergman, testified that these separate categories were required by the tort system and that they represented claims that were trial-listed, settled or documented by a certain date. Other than these vague assertions, no cogent explanation or rationale has ever been given for these categories or how claims held in certain law firms' "inventories" were categorized. Notably, members of the prepetition committee appear prominently in all of the secured categories. See Plan of Reorganization. Exhibit 6, Appendices A, B and C. These categories are designated as classes in the plan of reorganization, and are given the same treatment as provided for in the trust. The attorneys for both the creditors committee (which consists exclusively of plaintiffs' asbestos lawyers, a majority of which were on the prepetition committee), and the futures representative stated that they had investigated the security interests held by the various classes of asbestos claimants, and determined that it was unlikely they could be avoided under any theory.

Even though each category has different rights and priorities, all of the categories contain exactly the same sorts of claims. Thus, a claimant in Category A who has some evidence of asbestos exposure but who is not sick would have been paid in full prepetition, while someone with mesothelioma, who was not included (for whatever reason) in Categories A through D, in all probability will never receive anything.

On April 17, 2002, Hipolot executed a "Claim Security Agreement and Assignment" and "Settlement Agreement Between ACandS, Inc. and Various Asbestos Claimants." Among other things, the latter document required the appointment of "an independent claims reviewer" to review claims documentation provided by Category D claimants. Apparently towards that end, on May 14, 2002, Kenesis, a company that was 70% owned by GHR, was hired by ACandS to review some 250,000 claims at a fee of $3 million, or $12 a claim. Unbeknownst to ACandS, the bulk of this work was subcontracted out to Clearing House LLC of Mt. Pleasant, South Carolina at a fee of $2,000,000. The sole principal of Clearing House was J. Banee Wallace, a paralegal allegedly on leave from the law firm of what was then know as Ness Motley. Joseph Rice was a member of Ness Motley, and the chairman of the prepetition committee. Kenesis purchased Clearing House in June of 2003. *ACandS I* at 399–400; Travelers Exhibit CC. Neither Kenesis nor Clearing House could be considered "independent," even under the most imaginative use of the word.

Between the time of Kenesis' appointment and the time the petition was filed, ACandS settled over $2 billion in claims. It had settled only $600 million in claims in the preceding 20 years. The plan mandates that none of these settlements can be challenged or reviewed either by the asbestos trust or by ACandS.

While all of this was going on, Irex and one of its affiliates, SPI, were busy trying to extricate themselves from potential

fraudulent transfer and other claims arising out of transactions between ACandS, Irex and other affiliates. After extensive negotiations with the prepetition committee, the parties agreed as follows: in exchange for payment to the asbestos trust of $10,000,000, as well as the transfer to the trust of 100% of the stock of ACandS and all of its rights under the insurance policies, Irex and its affiliate, SPI, will receive a release and be covered by the § 524(g) injunction. This settlement was reviewed by the financial adviser for the postpetition unsecured creditors committee, L. Tersigni Consulting, P.C. After additional and difficult negotiations, Irex agreed to raise the cash component of the deal to $12.5 million, which amounts to over 40% of Irex' present net worth. Mr. Lawrence Fitzpatrick, the representative for future claimants, and his professionals have reviewed the settlement, and vouch for its fairness.

■ Travelers has raised numerous objections to the plan under § 1129, many of which were addressed in open court. To summarize those rulings, the plan does not violate any of my previous directives in this case. Most importantly, it is "insurance neutral," in that it does not affect any of Travelers' rights under its insurance policies. As I indicated at the hearing, I have concluded that those policies are not executory contracts, and thus none of the provisions of § 365 apply. *See, e.g. Argonaut Insurance, Co. v. Ames Dept. Stores, Inc.,* 1995 WL 311764 a 3* (S.D.N.Y.1995). The issue which remains is whether those policies can be assigned to the trust in their entirety under Pennsylvania law, notwithstanding the anti-assignment provision they contain. I conclude that they can. As was held in *Continental Cas. Co. v. Diversified Industries, Inc.,* 884 F.Supp. 937, 946 (E.D.Pa.1995):

Consistent with the general purposes of non-assignment clauses...courts are reluctant to restrict the assignment of an insured's right to payment which has already accrued...Therefore, because an insured's right to proceeds vests at the time of the loss giving rise to the insured's liability, restrictions on an insured's right to assign its proceeds are generally void.

*Citing National Memorial Services, Inc. v. Metropolitan Life Insurance, Co.,* 355 Pa. 155, 49 A.2d 382 (1946)

There is no question that the loss giving rise to the liabilities in this case have already accrued, thus making the policies assignable to the trust.

■ Travelers challenges the Irex settlement on two grounds. It first argues that the settlement fails to meet the four-part test of *In re Martin* 91 F.3d 389, 393 (3rd Cir.1996). In determining whether to approve a settlement, I am required to assess and balance: (1) the probability of success in the litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved; and (4) the paramount interest of the creditors.

Based upon the evidence presented, I find that the probability of success on the merits of claims brought against Irex and its affiliates is not promising. The dividend transfers occurred at a time when ACandS was generally profitable, thus eliminating their avoidance on fraudulent transfer grounds. The Lancaster sale was supported by a fairness opinion from Snyder & Co., and Travelers has presented no evidence to refute that opinion. The indemnification obligations flowing between ACandS, Irex and other entities are not atypical for a holding company, and would yield little, if anything, in the way of damages. The loans and service payments to Irex may be suspect, but must be more than suspect in order to undo them.

As for the difficulties of collection, it seems unlikely that the $12.5 million in payments over 7 years could be improved upon even if ACandS prevailed on all $25 million in potential claims. Any attempt to collect such a judgment in full immediately would probably drive Irex into bankruptcy, with all of its attendant delays and inevitable expense. The litigation expense in attacking the transactions in questions, and the time it would take to do so, are prohibitively expensive, especially given the uncertainty of the outcome.

Finally, the overall interests of the creditors are well served by this settlement. Not only is Irex paying a substantial percentage of its net worth in each, but it is assigning all of its rights to the insurance policies that insured both it and ACandS. That assignment eventually may well dwarf the cash component of the settlement. Accordingly, I find that the settlement meets the Third Circuit's requirements. It follows that Travelers' objection to the settlement on the grounds that it does not meet the best interests of creditors test of § 1129(a)(7) must also be overruled.

■ To the extent that the plan limits the right of Travelers to object to claims under § 502(a), that limitation is consistent with § 524(g)(2)(B)(ii)(V). However, it is equally clear that this plan otherwise does not comply with that section. Both the language of the statute itself and its legislative history mandate this conclusion. Section 524(g)(2)(B)(ii)(V) empowers the asbestos trust to manage present and future claims through various mechanisms, but those mechanisms must "provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands *that involve similar claims in substantially the same manner.*"(Emphasis added.) The trust established in ACandS' plan of reor-

ganization does nothing of the kind. Not only does the plan discriminate between present and future claims, it pays similar claims in a totally disparate manner by giving preferential treatment to certain claimants who are secured by insurance proceeds. Those security interests were not granted based upon the medical condition of those claimants, but rather because, for whatever reason, they were first in line and able to carve out seemingly unassailable security interests. Nothing could be further from what the drafters of § 524(g) intended, as is evident from the legislative history, which states in pertinent part:

> In order for future claimants to be bound by a trust/injunction, section 111 requires that the trust operate in a structure and manner necessary to give reasonable assurance that the trust will value, and be able to pay, *similar present and future claims in substantially the same manner.* (Emphasis added.) 140 Cong. Rec. H 10,764 (October 4, 1994).

Section 524(g)(2)(a) makes clear that as a condition to obtaining the relief provided by the statute, the court must find that all of its requirements have been met, even if no one objects. Because compliance with all of the subpart of § 524(g)(2)(B) is a prerequisite to the issuance of a channeling injunction, and because this subpart clearly has not been met, no such injunction may enter. Accordingly, the plan does not comply "with the applicable provisions of this title" under § 1129(a)(1), and therefore confirmation of the plan must be denied.

■ Even if all of the requirements of § 524(g) were met, I would deny confirmation of the plan as not having been proposed in good faith under § 1129(a)(3). The good faith requirement was ably summarized by Judge Mary Walrath of this

court in *In re Coram Healthcare Corporation,* 271 B.R. 228, 234 (Bankr.D.Del.2001):

> "The good faith standard requires that the plan be 'proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code.'" ... In evaluating the totality of circumstances surrounding a plan a court has " 'considerable judicial discretion' in finding good faith, with the most important feature being an inquiry into the 'fundamental fairness' of the plan." (Citations omitted.)

The plan under consideration falls short of this standard in nearly every respect. Although ACandS was represented during the course of the prepackage negotiations, the correspondence among plaintiffs' asbestos counsel presented at trial indicates that the plan was largely drafted by and for the benefit of the prepetition committee. It was the prepetition committee that drafted (or more likely directed debtor's counsel in drafting) the prepetition trust, and apparently chose the trustee for the trust; it was the prepetition committee that decided how the security agreement would be crafted and how many classes of security interests would be formed; and it was the prepetition committee that decided who was going to get what. Travelers Exhibit CC. ACandS was there to do their bidding, having been thrown overboard by Irex to keep what was left of that company afloat. Given the unbridled dominance of the committee in the debtor's affairs and actions during the prepetition period, its continued influence flowing from its majority status on the postpetition creditors committee, and the obvious self-dealing that resulted from control of the debtor, it is impossible to conclude that the plan was consistent with the objectives and purposes of the Bankruptcy Code.

It is also impossible to conclude that this plan is imbued with fundamental fairness. Although the plan may meet the technical classification requirements of § 1122 and § 1129(b), it is fundamentally unfair that one claimant with non-symptomatic pleural plaques will be paid in full, while someone with mesothelioma runs the substantial risk of receiving nothing. Both should be compensated based on the nature of their injuries, not based on the influence and cunning of their lawyers. The court is informed that other judges have confirmed plans with such discriminatory classifications. This judge cannot do so in good conscience.

Accordingly, for the reasons stated above, the confirmation of the debtor's plan of reorganization is hereby denied.

IT IS SO ORDERED.